IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

NO. 7:18-CR-147-FL-1

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JENOURI ROBERTS, | ) | ORDER |
| | ) | |
| Defendant. | ) | |

This matter is before the court on defendant's motion to suppress certain evidence allegedly obtained in violation of the Fourth Amendment to the United States Constitution. (DE 17). Pursuant to 28 U.S.C. § 636(b)(1), United States Magistrate Judge Robert T. Numbers, II, issued memorandum and recommendation ("M&R"), wherein it is recommended that the court deny defendant's motion. (M&R (DE 25)). Defendant timely filed objections to the M&R, (DE 28), to which the government responded in opposition, (DE 29). For the reasons that follow, the court adopts the recommendation of the magistrate judge as its own and denies defendant's motion.

## STATEMENT OF THE CASE

On September 6, 2018, the grand jury returned indictment, charging defendant with one count possession of a firearm by a felon in violation of 18 U.S.C. §§ 922(g)(1) and 924.

On October 15, 2018, defendant filed the instant motion to suppress evidence seized from his vehicle on January 27, 2018. Evidentiary hearing was held before the magistrate judge on December 17, 2018, at which hearing the court received testimony from Stephen Applewhite ("Applewhite"), who pulled over defendant's vehicle on January 27, 2018. (See Tr. (DE 23)). The magistrate judge issued M&R on January 25, 2019. (See M&R (DE 25)).

In objections to the M&R, defendant makes factual and legal arguments. Regarding the

latter, defendant argues the magistrate judge erred in determining Applewhite had reasonable suspicion to determine defendant was armed and dangerous sufficient to justify the frisk that occurred.

**STATEMENT OF THE FACTS**

Upon de novo review of the evidence, the court adopts the factual findings of the M&R. The court summarizes herein the facts most pertinent to addressing the objections to the M&R raised by defendant.

On January 27, 2018, around 9:00 p.m., Applewhite, who is with the Wilmington police department, pulled over a vehicle with expired tags. (Tr. (DE 23) at 5:1-5; body-camera footage at 21:51).[1] As Applewhite approached the vehicle, he noticed defendant reaching into his pocket, which aroused Applewhite's suspicions, but when Applewhite reached the driver's side window, he realized defendant was only reaching for his license. (Tr. (DE 23) at 6:20-7:10).

Applewhite asked for defendant's license and registration, and defendant turned over his license to Applewhite, but informed Applewhite that he did not know where the registration was because he had borrowed the car. (Body-camera footage at 21:51). Applewhite asked defendant to check the car's glove box for the registration paperwork, and defendant complied, also checking the storage space next to the steering wheel. (Id.).

During this time, Applewhite and defendant chatted about defendant's plans to celebrate a friend's birthday party, and Applewhite confirmed from defendant that the vehicle belonged to defendant's daughters' mom. (Id. at 21:51-52). Applewhite told defendant to inform the owner of

---

[1] At the suppression hearing, only the first eight minutes and thirty-six seconds of Applewhite's body-camera video was admitted into evidence as the government's Exhibit 1. (See Tr. (DE 23) at 16:11–24). Defendant has filed the complete video with his objection to M&R. (See notice of manual filing of body-camera footage (DE 28-1)).

the vehicle about the expired tags, and Applewhite and defendant discuss how defendant and friends need to use another vehicle for their plans for the evening. (Id. at 21:52). Defendant is calm, helpful, and agreeable.

Applewhite returned to his patrol car with defendant's license, and officer Centola ("Centola") arrived on the scene and joins Applewhite in his vehicle. (Id. at 21:53). Applewhite ran defendant's license through a program in his patrol vehicle to determine the license is valid and that defendant has no outstanding warrants. (Tr. (DE 23) at 7:23-8:2). Applewhite begins to explain to Centola about his initial concern that he thought defendant was reaching for a weapon and not his wallet when Applewhite initially approached defendant's car. (Body-camera footage at 21:53).

The police department's file on defendant appeared on Applewhite's computer screen, and Applewhite stated to Centola that "he's flagged for gangs" and "we're going to do a weapons frisk on him." (Id. at 21:53). The North Carolina Department of Public Safety[2] had validated defendant as a gang member. (Tr. (DE 23) at 11:8–10). Several other "flags" also appeared alongside defendant's gang flag, including an "approach with caution" warning, and flags showing he was a felon and had previous weapons and assault charges. (Id. at 10:10–11:23). During this time, Applewhite noted to Centola how defendant was "looking nervous as hell." (Body-camera footage at 21:54).

Applewhite returned to defendant's car, told defendant he would give him a warning for driving with an expired tag, and that he would need to tell the car owner to update the registration. (Id. at 21:55). Applewhite then asked defendant if he had any weapons on him or in the car, which defendant denied, but Applewhite asked if he could do a weapons frisk anyway. (Id. at 21:55-56).

---

[2] Applewhite referred to the North Carolina Department of Corrections, but the correct name for that agency is the North Carolina Department of Public Safety or NCDPS.

After Applewhite said he "wasn't going to do a search or anything," defendant voluntarily got out of the car. (Id. at 21:56).

As he was getting out of the car, defendant indicated concern why he was being frisked, and Applewhite stated he was going to frisk defendant because he was flagged as a gang member and was looking nervous, to which defendant responded that he was nervous because he was being pulled over. (Id.). Applewhite found nothing while frisking defendant, and after, asked defendant to step to the side. (Id.)

Applewhite then shined his flashlight on the storage compartment on the inside of the driver's side door, and then on the left and then right side of the driver's seat. (Id. at 21:56). Applewhite noticed "the black strip of a gun . . . tucked in between the driver's seat and the center console." (Tr. (DE 23) at 23:5-7). He immediately walked over to defendant, who was standing between his car and the patrol car, and handcuffed him. (Body-camera footage at 21:57). Applewhite walked back to the car, removed the gun, and searched the entire car with another officer. (Tr. (DE 23) at 23:14–24:3).

Additional facts pertinent to the motion will be discussed herein.

## COURT'S DISCUSSION

A.  Standard of Review

The district court reviews de novo those portions of a magistrate judge's M&R to which specific objections are filed. 28 U.S.C. § 636(b). The court does not perform a de novo review where a party makes only "general and conclusory objections that do not direct the court to a specific error in the magistrate's proposed findings and recommendations." Orpiano v. Johnson, 687 F.2d 44, 47 (4th Cir. 1982). Absent a specific and timely filed objection, the court reviews only for

4

"clear error," and need not give any explanation for adopting the M&R. Diamond v. Colonial Life & Accident Ins. Co., 416 F.3d 310, 315 (4th Cir. 2005); Camby v. Davis, 718 F.2d 198, 200 (4th Cir. 1983). Upon careful review of the record, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).

B.  Analysis

Although warrantless searches of a vehicle are "presumptively unreasonable," several exceptions exist. United States v. Holmes, 376 F.3d 270, 274–75 (4th Cir. 2004). Of relevance to this case,

> the search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant the officers in believing that the suspect is dangerous and the suspect may gain immediate control of weapons.

Michigan v. Long, 463 U.S. 1032, 1049 (1983) (citations omitted). Thus, to conduct a lawful search pursuant to such safety concerns, "an officer must possess a reasonable belief of both (1) the suspect's dangerousness and (2) the possibility that the suspect might gain immediate control of any weapons inside the vehicle." United States v. Griffin, 589 F.3d 148, 153 (4th Cir. 2009). The court must examine "the totality of the circumstances in determining whether the requisite reasonable suspicion existed." United States v. McCoy, 513 F.3d 405, 411 (4th Cir. 2008).

Here, the second prong of the above inquiry, whether defendant might have gained immediate control of a weapon inside the vehicle, is not in dispute.[3] Thus, the court turns to

---

[3] As stated by the magistrate judge, and not objected to by defendant, "Roberts is an able-bodied man who would be sitting in the driver's seat of the vehicle after Applewhite issued his warning about the expired registration. An objectively reasonable officer would suspect that he could access concealed weapons in any number of places from that position." (M&R (DE 25) at 5).

5

defendant's objections concerning the first prong of the inquiry, whether Applewhite had a reasonable belief of defendant's dangerousness based on what the knew when he conducted the weapons frisk of defendant and his vehicle.

1.      Factual Objections

Defendant argues two factual objections. First, defendant argues that magistrate judge incorrectly found that Applewhite decided to perform a weapons frisk on defendant when he observed the flags for gang membership <u>and</u> prior criminal history, where on the night in question Applewhite solely referenced defendant's gang membership. (DE 28 at 2-3 (citing body-cam footage at 21:54 ("he's a gang member . . . we are going to do a weapons frisk"); <u>see also</u> <u>id.</u> at 22:05 (Applewhite stating "gang member, nerve-wracking for sure"); <u>id.</u> at 22:09 (Applewhite stating "with my nerves, I'm not really focused on the small details right now")). Second, defendant "objects to Officer Applewhite's characterization of his demeanor," which Applewhite stated was defendant "looking nervous as hell," where Applewhite "did not describe why he came to that conclusion on that evening" and where "the video does not show Mr. Robert's alleged movements." (DE 28 at 3).

Both of defendant's factual objections are based on what Applewhite said, or did not say, on the night in question as recorded by Applewhite's body-camera recording. However, it is not necessary for an officer to articulate out loud to a body-camera recording all thoughts. Applewhite testified, which the magistrate judge found credible, that Applewhite decided to perform a weapons frisk on defendant when he observed multiple warning flags for the defendant on the patrol car computer for gang membership, being a convicted felon, weapons charge, assault charge, and "AWC," denoting approach with caution. (<u>See</u> Tr. (DE 23) at 8:18-21, 12:12-20). Similarly, just

6

because Applewhite did not say out loud why defendant looked nervous on the evening in question does not undercut Applewhite's testimony provided thereafter that he perceived defendant to appear nervous. (See id. at 8:9-17, 9:1-8, 9:14-17, 21:6-23).[4]

The court, therefore, rejects defendant's factual objections to the magistrate judge's findings.

2. Legal Objections

The magistrate judge concluded as follows:

> In sum, the court must evaluate the totality of the circumstances that Applewhite faced when he performed the protective frisk on Roberts and his vehicle. When he performed the frisk, Applewhite knew about Roberts's violent criminal history; was told by his computer that was a person that he should "approach with caution"; he had a verification from the NCDPS that Roberts had an affiliation with a gang; and he also believed that Roberts was acting unusually nervously when the officer went back to his patrol car. These factors, taken together, were enough to make a "reasonably prudent man" believe that Roberts was dangerous and thus justified the protective search that yielded the gun that the Government is using in its case against Roberts.

(M&R (DE 25) at 9-10 (citing Long, 463 U.S. at 1050)).

Defendant argues that the above factors considered by the magistrate judge "whether considered singly or in combination, do not support reasonable suspicion that he was armed and dangerous." (DE 28 at 4).

As stated by the Fourth Circuit, "'absent signs of nervousness beyond the norm, we will discount the detaining officer's reliance on the detainee's nervousness as a bases for reasonable suspicion.'" United States v. Massenburg, 654 F.3d 480, 490 (4th Cir. 2011) (quoting United States

---

[4] The court additionally rejects defendant's argument that because Applewhite testified at hearing that defendant "was not sweating, his voice was steady, and he did not throw up any gang signs" and was not observed doing anything illegal, (DE 28 at 3), the magistrate judge overlooked factors favorable to defendant when ultimately concluding that the totality of the circumstances supported concerns about dangerousness, particularly where the magistrate judge noted that defendant was "polite, amiable, and did not seem overly-nervous" during "face-to-face interactions." (M&R (DE 25) at 9). An officer may have a reasonable suspicion of dangerousness even where a defendant is "not suspected of committing a crime" and "fully cooperated with police orders." Holmes, 376 F.3d at 276.

7

v. Salzano, 158 F.3d 1107, 1113 (10th Cir. 1998)); see also United States v. Palmer, 820 F.3d 640, 652–53 n.7 (4th Cir. 2016) ("[A] driver's nervousness is not a particularly good indicator of criminal activity, because most everyone is nervous when interacting with the police."); United States v. McFarley, 991 F.2d 1188, 1193 (4th Cir. 1993) (defining "unusually nervous" behavior as shaky hands, heavy breathing, and providing inconsistent information).

Here, Applewhite testified regarding defendant's nervousness as follows:

> I started to notice that he was moving about in the car in a unusual way . . . . He was looking to his left, using the driver's side mirror, as well as turning to the left, looking back through the car. Also looking through the rearview mirror and also turning completely to his right looking directly back through the windshield -- or the back windshield, so . . . . it was a constant movement. It was -- appeared very nervous-like, in my opinion. Officer Sintola noticed it, too, and brought it to my attention as well. We were discussing how he was just moving about in an unusual way; it just seemed like he was -- in my professional opinion, usually when somebody's doing that, they're looking for escape route or they're trying to keep track of officers that were there. That's just how it seemed to me . . . . It's unusual for -- or usual for somebody to be constantly looking; that's one thing that we're trained on in the Academy is to be aware of somebody's certain movements and stuff like that. And that's what suggested, so.

(Tr. (DE 23) at 8:9-17, 9:1-8, 9:14-17). Applewhite additionally testified as follows:

> Q. Was that you in the recording repeating twice, "He's looking nervous as hell"?
> A. Yes, sir.
> Q. And what were you noticing at that time?
> A. Movements described, him looking to the left, using the mirrors to look behind him, as well as turning all the way completely to his right as well. Look -- constantly looking back at us . . . .
> Q. Would you do weapons frisk just because he's a gang member?
> A. No, it's based off also this movement. That's the main reason I didn't feel safe or comfortable continuing with the traffic stop.

(Id. at 21:6-23).

As did the magistrate judge, the court finds instructive the Fourth Circuit's direction in United States v. Neely, 564 F.3d 346, 352 (4th Cir. 2009). In that case, an officer stopped a

8

suspect's vehicle for driving without headlights. Id. at 348. The stop took place at night in a high-crime area. Id. During the stop, the officer asked the suspect, Neely, if he had any weapons in the car, to which he replied that he did not and offered to let the officer search his trunk. Id. Neely was fumbling with his car key for about 30 seconds to open the trunk, when the officer ordered him out of the car and frisked him for weapons. Id. The court found that Neely nervously fumbling with his keys while being watched by two officers "does not, without more, create a reasonable suspicion that Neely was <u>dangerous</u>." Id. at 352 (emphasis in original). However, the Fourth Circuit additionally stated as follows:

> Although the district court notes the late hour, the high-crime area, Neely's stumbling out of the vehicle, and Officer Tran's suspicion that Neely was lying about his reasons for being out, this case does not present the type of facts found sufficient in <u>Holmes</u> or <u>United States v. Elston</u>, 479 F.3d 314 (4th Cir.2007), to warrant a protective search. The defendant in <u>Holmes,</u> although cooperative during his search, was suspected to be a violent gang member with an outstanding arrest warrant. 376 F.3d at 277-78. Similarly, the officers in <u>Elston</u> possessed detailed information about the defendant due to a 911 call that identified the defendant as threatening to shoot someone in the near future. 479 F.3d at 318-19. By contrast, <u>Officer Tran had no information that would lead him to believe that Neely either had committed violent crimes in his past</u> or posed an immediate threat to the public.

Id. (emphasis added); see also Pegg v. Klempa, 651 F. App'x 207, 211 (4th Cir. 2016) (finding no reasonable suspicion where no evidence was presented plaintiff was "nervous, angry, or irritated," she had "no known criminal history or history of violence," there was "no evidence that the location of the traffic stop was a high crime area," and there was no "evidence that the officers actually believed that Mrs. Pegg posed a threat.").

Here, unlike in Neely and Pegg, Applewhite did have information that would lead him to believe that defendant had committed violent crimes in his past. Although a close case, defendant's unusual nervousness coupled with the multiple warning flags for defendant for gang membership,

9

being a convicted felon, weapons charge, assault charge, and AWC, is the "more" sufficient to support "a reasonable suspicion that [defendant] is dangerous," as directed by the Fourth Circuit. See Neely, 564 F.3d at 352.

Here, Applewhite believed that defendant was acting nervously when the officer was running his license in patrol car. Applewhite noted this perceived nervousness to Centola, who agreed with his assessment of defendant's behavior, as shown in the body-camera footage from the encounter. Additionally, a background check revealed that defendant was flagged as a gang member and a felon with previous weapons and assault charges and included a warning to approach with caution. Defendant argues that "[a] prior criminal record is not, standing alone, sufficient to create reasonable suspicion." (DE 28 at 4 (citing United States v. Sprinkle, 106 F.3d 613, 617 (4th Cir. 1997)). However, defendant's prior criminal record is not standing alone in this instance.

Defendant also argues that unlike cases relied upon by the magistrate judge, Holmes and United States v. Garcia, 459 F.3d 1059, 1060-61 (10th Cir. 2006), here Applewhite had no specific knowledge of defendant's prior criminal history and gang affiliation, where defendant had no outstanding warrant or pending charges, Applewhite did not know that defendant belonged to a gang known to be violent or use firearms, and Applewhite did not know how long ago defendant was affiliated with a gang or if he was even an active member (See DE 28 at 5).

In Holmes, the Fourth Circuit held the officers' belief that defendant was dangerous was reasonable in that "the officers had substantial reason to believe that one of the two occupants of the Navigator was 'Six,' a member of a gang whose members had carried out numerous violent felonies while armed, several of which were the subject of the arrest warrants that justified the Terry stop of the Navigator." 376 F.3d at 277. Although the officers in Holmes had access to more details

regarding the criminal history of the suspected occupant of the vehicle than the Applewhite had here regarding defendant, the Fourth Circuit stated in Holmes that "[q]uite simply, reasonable suspicion of a suspect's dangerousness need not be based solely on activities observed by the police during or just before the relevant police encounter, but can be based on the suspect's commission of violent crimes in the past—especially when those crimes indicate a high likelihood that the suspect will be 'armed and dangerous' when encountered in the future." Id. at 278. Here, as stated above, a background check revealed multiple warning flags for defendant for gang membership, being a convicted felon, weapons charge, assault charge, and AWC.

Likewise, in Garcia, the officer there had access to more details regarding the relevant criminal history. 459 F.3d at 1066 ("the police officers in this case knew that the apartment in which Mr. Garcia was found was connected with at least one member of the Lay Low Crips, a violent street gang with a history of firearms violence toward police officers"). However, defendant Garcia "was not dressed in gang attire" and argued "nothing about his appearance indicated to the officers that he was a member of a gang." Id. at 1067. Notwithstanding, the Tenth Circuit held that "it was reasonable for the officers to believe that the persons present in the front room, who were all apparently connected to drug transactions involving known and suspected gang members, all had some degree of gang affiliation," also holding that "[a]lthough not necessarily determinative by itself, that gang connection further supports the reasonableness of a weapons frisk of those present, including Mr. Garcia." Id. Here, defendant's gang connection further supported the reasonableness of the weapons frisk on defendant and his vehicle.

Finally, the time and location of the stop support the reasonableness of the weapons frisk. Occurring around 9:00 p.m., while the stop was "near" Wilmington's Market Street, a "standard

commercial area," (DE 28 at 6), the stop did not take place on that road. Instead it took place on a side street, Lennon Road, away from the bright lights and traffic. (Tr. (DE 23) at 5:7-9, 5:22-6:6). Rather than "in front of Jason's Deli" as stated by defendant, (DE 28 at 6), this spot on Lennon Road "in between Jason's Deli and MainStay Suites Hotel," "in the middle of the road." (Tr. (DE 23) at 5:22-6:6). The body-camera footage is inconsistent with defendant's claim that "the stop took place in a well-lit area," (DE 28 at 6), and confirms Applewhite's description of the spot as a "dark area of the road." (Tr. (DE 23) at 6:7-9). "Several" cars passed by, (DE 28 at 6), but that was over the course of an approximately 40 minute traffic stop. In this instance, the location was sufficiently isolated and dark to be of limited support of Applewhite's reasonable suspicion.

## CONCLUSION

Based on the foregoing, upon careful review of the M&R and the record, the court ADOPTS the recommendation of the magistrate judge as its own. Defendant's motion to suppress (DE 17) is DENIED. An order scheduling arraignment will follow.

SO ORDERED, this the 5th day of April, 2019.

LOUISE W. FLANAGAN
United States District Judge